## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **SHEBRI STACY DILLON,** | ) | |
| | ) | |
| Petitioner, | ) | Case No. 7:22CV00215 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **HAROLD CLARKE, VDOC,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Respondent. | ) | |

*Shebri Stacy Dillon, Pro Se Petitioner; Craig W. Stallard, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Respondent.*

Petitioner Shebri Stacy Dillon, a Virginia inmate proceeding pro se, has filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging her 2015 state convictions and sentence.  Upon review of the record and pleadings, I find that the petition must be dismissed.

I.

*A. Procedural History.*

On June 5, 2015, a grand jury in Roanoke County, Virginia, indicted Dillon for embezzlement, grand larceny, larceny of a firearm, forgery of a public record, three counts of uttering a forged public record, unlawfully obtaining a certificate of title, using a forged certificate of title, two counts of perjury, credit card fraud, obtaining money by false pretenses, and money laundering.  The prosecutor moved

to nolle prosequi two of the charges before trial, one perjury count and the count charging using a forged certificate of title.  The court at trial dismissed the charge of forging a public record for lack of sufficient evidence.  The jury found Dillon not guilty of larceny of a firearm but convicted her of the remaining ten charges. At the sentencing phase, the jury recommended a sentence of 10 years for grand larceny, 10 years for obtaining money by false pretenses, 10 years for money laundering, three years for perjury, and one year each for embezzlement, three counts of uttering, unlawfully obtaining a certificate of title, and credit card fraud.

The trial judge ordered a presentence report and presided over a sentencing hearing on July 26, 2016, by which time Dillon had secured new counsel.  She was sentenced as recommended by the jury, the court running the three 10-year sentences consecutively and the other nine years concurrently, for a total of 30 years' incarceration.  The court also imposed restitution in the amount of $98,900. The judgment order was entered on July 27, 2016.[1]

Counsel for Dillion filed a timely motion to set aside the verdict and grant a new trial.  The motion alleged that Dillon was prejudiced by the trial court's rulings on motions in limine, by admission of the expert testimony of a handwriting expert, and that after-discovered evidence suggested that two

---

[1] The judgment order was amended on November 22, 2019, nunc pro tunc to the original sentencing date, to add an additional six-month term of incarceration, which was suspended in lieu of six months of probation, as required by Va. Code Ann. § 19.2-295.2.

prosecution witnesses fabricated their testimony.  Following a hearing on August 15, 2016, the trial court denied the motion.  Dillon appealed her conviction to the Court of Appeals of Virginia, which granted her petition to appeal on a single issue involving a challenge to venue on one charge.  After full consideration, the court affirmed her conviction.  *Dillon v. Commonwealth*, No. 1375-16-3, 2017 WL 4506557 (Va. Ct. App. Oct. 10, 2017) (unpublished), *reh'g en banc denied* (Nov. 8, 2017).  The Supreme Court of Virginia refused her petition for appeal on July 13, 2018.  Dillon did not petition for certiorari to the United States Supreme Court.

On June 6, 2019, Dillon filed a state habeas petition, raising the same issues raised in her current § 2254 petition.  On January 15, 2021, the trial court denied the petition.  The Supreme Court of Virginia refused her appeal on March 24, 2022, and refused her petition for rehearing on May 11, 2022.

### B. Factual Background.

The evidence at trial showed that Warren Thompson, Jr., inherited a small home in Roanoke County from his father.  In February 2013, Dillon and her four children moved in with him because and Dillon helped Thompson manage his meals and epilepsy medication.

In January 2014, Thompson purchased a used 2003 Mitsubishi Eclipse for $6,000 to $7,000, and a $1,300 sound system from BestBuy, which he installed in the car.  Thompson was arrested on Friday, February 4, 2014, for carnal knowledge

of a 13-year-old, a felony.  He asked Dillon to take care of his bills while he was locked up and to put money on his jail account.  He had approximately $3,200 in his bank account at the time, and he received just over $900 monthly from his social security disability.  Dillon put money on his jail account at first, but nothing after March 6, 2014.  He was no longer able to reach Dillon by telephone thereafter.

Thompson ultimately pled guilty to the charges and received a one-year sentence.  When he was released from custody, his house had been sold, and all his belongings were gone, including his furniture, video game consoles, car, compressors, and tools.  His bank account was empty.  He denied ever giving a power of attorney to Dillon and denied deeding the house to her, although he admitted that she had the bank card to his account and knew the PIN number for the card.  Trial Tr. 52–72.

Linda Young, a notary, identified at trial a power of attorney from Thompson to Dillon and a deed of gift to Dillon for the house, both bearing the apparent signature of Thompson and notarized by Young.  Young admitted that she had notarized the documents falsely, in that Dillon had signed them, not Thompson.  Because Thompson was in jail when she notarized the false signatures, Young stated that she backdated the documents to January 4, 2014.  At the time she notarized them, she believed that it was what Thompson wanted, based on a

conversation in late 2013, in which Thompson said he wanted to take care of Dillon and her children and to put Dillon in control of things if anything happened to him, so that his estranged wife did not come in and try to take everything.  When a detective questioned her about the documents in December 2014, Young told him Thompson had signed the documents in her presence on January 4, 2014.  She admitted telling this to the detective several times, and she did not change her story until sometime in September 2015.  She admitted that she had four felony charges pending against her arising from her conduct but denied that she had discussed any plea deal with the prosecution and denied that she had been promised any favorable treatment in exchange for her testimony. *Id.* at 14–28.

Robert Horton, a forensic document examiner, testified that he had compared the signatures on the deed and the power of attorney with several samples of signatures known to belong to Thompson.  He concluded that Thompson had not signed the deed or the power of attorney, but that someone had simulated Thompson's handwriting.  Horton further stated that he could not identify who signed Thompson's name to the documents, because the person was simulating Thompson's handwriting rather than writing in his or her own natural handwriting.  Horton also acknowledged that there is some subjectivity to handwriting analysis, that a person's writing can change over time, and that intoxication, drug use, illness, or injury to an extremity can cause changes affecting

the ability to confirm the identity of a person who signed a document. *Id.* at 87–113.

Other evidence at trial established that Dillon presented the forged deed to a clerk's office on February 24, 2014, where the deed was officially recorded, and Dillon paid the filing fee. *Id.* at 29–32. Dillon contacted Quick Fix Real Estate on March 25, 2014, about selling the home, and by July 17, 2014, she entered a contract to sell the house for $40,000, to be paid after closing once all belongings were removed from the home. Quick Fix assigned the sale to Star City Investments, and closing was handled on July 31, 2014, by Douglas Wilson, Jr., to whom Dillon provided a certified copy of the recorded forged deed. The house was vacant, as agreed, and the sales proceeds, less outstanding real estate taxes, were wired to Dillon's bank account, per Dillon's instructions. Star City made $20,000 of improvements to the house and then leased it to tenants. *Id.* at 117–140.

Before Dillon sold the house, Thompson's estranged wife, Ms. Clark, came to the house on February 28, 2014, and wanted to remove property. Officer Thayer responded to the scene, having been advised by dispatch that police had previously been called to the home regarding similar incidents with Ms. Clark. Dillon presented Officer Thayer a recorded deed, showing that the house was hers, and he escorted Clark off the premises. *Id.* at 140–142.

DMV records corroborated testimony that Dillon used the forged power of attorney to transfer the title to the Mitsubishi to her name on February 27, 2014. *Id.* at 32–38.  In April 2014, Dillon sold the Mitsubishi to AutoMart for $2,200. *Id.* at 50–51.

Dillon and Thompson both had their bank accounts at BB&T.  Thompson's account records reflected daily ATM withdrawals of $500 from February 8 through February 11, 2014, as well as other withdrawals and a purchase, exhausting the account by March.   Dillon's account statement reflected a wire deposit of $38,878.47.  After two cash withdrawals ($5,000 and $3,000), motel and dining expenses in Myrtle Beach, South Carolina, and several debits from Wal Mart, the money was gone within three months.  Inmate account records from the Western Virginia Regional Jail showed that Dillon made deposits on Thompson's account totaling $290, the last deposit being on March 6, 2014.  *Id.* at 149–55.

Authenticated inmate phone records and recorded calls revealed calls from Thompson to Dillon every day during the first week of his incarceration, sometimes more than once a day.  He completed calls to Dillon at least twice a week through the remainder of February.   Two of the phone calls between Dillon and Thompson were played for the jury.  In the call on February 7, 2014, Dillon told Thompson she needed a rental agreement to be drawn up for the house.  On February 14, 2014, she told Thompson that she knew the PIN for his bank account

and that she had gone to the dealer to get the license plates for his car. In later phone calls with his first ex-wife, Cynthia, Thompson expressed concerns about not being able to reach Dillon by phone and not having money on his inmate account, and he also expressed that he was concerned that Dillon might be taking his money. Trial Tr. 73–78.

The defense called four witnesses, including Thompson's next-door neighbor, Marvin Cooper, and his son Jonathan Cooper, and two others, James Switzer and Andrian Diorec. Each of them testified about different conversations with Thompson in which Thompson had said he planned to sign his house over to Dillon when he went to jail. *Id.* at 175, 183, 185–195. Jonathan Cooper testified that he had been at the home with Dillon's children in the living room when Dillon and Thompson were outside on the patio signing something that Thompson called a gift deed.

## II.

Dillon raises the following claims in her timely § 2254 petition:

### A. *Prosecutorial Misconduct Claims.*

1. The prosecution misappropriated case connections and tampered with evidence to prevent Dillon from putting on a defense.

2. The prosecutor instructed the jury to disregard the law during closing argument, violating Dillon's Fifth and Sixth Amendment rights.

3. The prosecutor instructed the jury to sentence Dillon for something she was not on trial for, as a societal deterrent to mob bosses.

4. The prosecutor improperly vouched for the credibility of his witness, Linda Young, violating Dillon's Fifth Amendment Due Process rights.

5. The prosecutor failed to disclose a plea deal with Linda Young, violating Dillon's Fifth and Fourteenth Amendment rights.

6. The prosecutor and detective threatened witnesses to prevent Dillon from putting on her defense.

### B. Prosecutorial Misconduct/Trial Court Error.

7. The prosecutor induced and the court allowed plain error when the prosecutor continued to prosecute Dillon after the court dismissed the forgery conviction, which was the foundation of his case.

### C. Ineffective Assistance of Trial Counsel.

8. Counsel failed to inform Dillon about a pivotal hearing in her case.

9. Counsel failed to reasonably investigate and impeach the prosecution's witnesses.

10. Counsel misinformed Dillon of the time she faced in prison.

11. Counsel failed to secure a handwriting expert in Dillon's defense.

12. Counsel failed to obtain transcripts from Dillon's April 20, 2015, preliminary hearing.

13. Counsel failed to obtain police reports for the year before Thompson's incarceration regarding police complaints made by Thompson against his estranged wife.

14. Counsel failed to introduce any of the evidence that Dillon had given him.

15. Counsel failed to prepare Dillon and her case for jury sentencing, lying to the court to try to cover his failure.

16. Counsel failed to inform Dillon of her right to testify until called upon at trial, then telling her that if she testified, she was waiving her right to appeal.

17. Counsel failed to request a continuance of trial.

18. Counsel created a conflict of interest by behaving inappropriately with Dillon.

19. Counsel failed to move to strike and dismiss all charges once the forgery charge was struck.

20. Counsel failed to object to prosecutorial misconduct.

21. Counsel failed to familiarize himself with the details of Dillon's case and the elements of her charges.

*D. Ineffective Assistance of Sentencing and Appellate Counsel.*

22.  Counsel failed to object to an outrageous and unsubstantiated amount of restitution.

23.  Counsel failed to object to Dillon being sentenced by the judge for "stealing a house."

24.  Counsel failed to familiarize himself with the details of the case, filing incorrect motions and inadequate briefs.

25.  Counsel refused to raise a claim of prosecutorial misconduct on appeal.

*E. Cumulative Error.*

26.  The cumulative effects of the errors above deprived Dillon of her right to effective counsel and her right to due process of law, to her prejudice.

### III.

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  There is a presumption of correctness that attaches to the state court's finding of facts, which can be overcome only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  When reviewing a state court's assessment of an ineffective assistance of counsel claims, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under *Strickland v. Washington*, 466 U.S. 668 (1984).  *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).  In other words, the federal court is to afford "both the state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

A federal district court reviewing a § 2254 petition is also limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds.  The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights.  *Coleman v. Thompson*, 501 U.S. 722, 730–31.

To exhaust his claims, a petitioner must present his federal constitutional claims to the highest court before he is entitled to seek federal habeas relief.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Further, the petitioner must

present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995). Failure to do so "deprive[s] the state courts of an opportunity address those claims in the first instance." *Coleman*, 501 U.S. at 732.

A separate but closely related issue is the doctrine of procedural default. If a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that provides an independent and adequate ground for the state court's decision, that claim is procedurally defaulted for purposes of federal habeas review. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A state procedural rule is independent if it does not depend on a federal constitutional ruling, and it is adequate if it is firmly established and regularly applied by the state court. *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1998). A claim that has not been presented to the highest court and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now is considered simultaneously exhausted and defaulted. *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990).

Before a federal habeas court will consider a procedurally defaulted claim, the prisoner must show both cause for the default and actual prejudice to the prisoner from the claimed federal violation. *Coleman*, 501 U.S. at 750. Cause for procedural default requires the existence of some objective factor, external to the

defense and not attributable to the prisoner.  *Id.* at 753.  To show prejudice to overcome procedural default, a petitioner must show that the claimed violation worked to his "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

IV.

*A. Claims for Prosecutorial Misconduct and Trial Court Error.*

Objections to the prosecutor's actions before and during trial and to the actions of the trial court must be made contemporaneously with their occurrence during the trial.  The purpose of this contemporaneous objection rule is to avoid unnecessary appeals by affording the trial judge an opportunity to rule intelligently on the objections.  *Maxwell v. Commonwealth*, 754 S.E.2d 516, 519 (Va. 2014).  On appeal, the courts generally will not consider errors that were not raised in the trial court, except for good cause or to attain the ends of justice.  Rules of S. Ct. of Va., Rules 5:25, 5A:18.  Likewise, under Virginia law, claims that could and should have been raised at trial and on direct appeal cannot be raised in state habeas proceedings.  The writ of habeas corpus is not a substitute for the appellate process.  *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974).  Relying upon *Slayton*, the trial court considered Dillon's claims 1 through 7 procedurally defaulted.  *Dillon v. Warden*, No. CL19-790-00, Final Order 4 (Roanoke Cnty. Cir.

-14-

Ct. Jan. 15, 2021).  The rule in *Slayton v. Parrigan* has long been recognized as an independent and adequate state law ground for dismissing a habeas claim.  *Vinson v. True*, 436 F.3d 412, 417 (4th Cir. 2006).  Accordingly, these claims are procedurally defaulted for purposes of federal habeas review.

This court cannot consider these claims unless Dillon can show both cause for default and prejudice from the claimed violations.   Dillon has alleged ineffective assistance of trial counsel and of appellate counsel as her cause for defaulting the issues.  The state habeas court held that Dillon had failed to establish ineffective assistance of counsel, and I must defer to the state court's determinations unless they are unreasonable.  Even if Dillon cleared this hurdle, she must also show prejudice, which she cannot do.  For the reasons discussed below, Dillon has failed to overcome her procedural default on claims 1 through 7.

Claim 1 – Misappropriating Case Connections
and Tampering with Evidence.

Dillon claims that the prosecutor knowingly and falsely argued to the trial court that her case was unrelated to Thompson's carnal knowledge case, even though the prosecutor transferred evidence from Thompson's case to hers and allegedly deleted from the court file the prosecution's subpoena for Dillon to be a state witness in Thompson's case.  Dillon is not prejudiced by default of this claim because it has no merit.

The prosecutor's argument that the two cases were not related was a reasonable position for him to take. Defense counsel asked Thompson if he had asked Dillon to talk to the "young lady you were charged with having sex with," and the prosecutor objected, noting "I think we need to stick with relevant matters." Trial Tr. 69. The court accurately responded, "I don't think anybody is going to disagree with that. *You're just going to disagree with what constitutes relevance*." *Id.* (emphasis added). Rather than explain why the question was relevant, defense counsel withdrew the question. The prosecutor was entitled to assert the state's position that the two cases had nothing to do with each other; the court had nothing to rule on when defense counsel withdrew the question. Either way, there was no prosecutorial misconduct in arguing relevance.

As for the subpoena missing from Thompson's court file, Dillon has offered no evidence that the prosecutor in her case had anything to do with the subpoena's absence. The subpoena could have been served on a different date than the others requested in the file, and the return never made it back to the file; the subpoena could have been misfiled. Nothing but speculation places the blame at prosecutor Miller's feet. Further, because Dillon had a copy of the subpoena herself, nothing prevented her from providing the copy to her attorney for use at trial (as she later did for the post-trial motion).

Finally, the evidence does not support Dillon's assertion that the phone call in which she was trying to get Thompson to make incriminating statements was taken from Thompson's case. Detective Finney testified that he listened to every jail phone call between Dillon and Thompson as part of his investigation of Thompson's complaints about the theft of his property. *Id.* at 76–78. While that phone call was also relevant to the case against Thompson, it does not convert the detective's investigatory actions in Dillon's case into prosecutorial misconduct.

Claim 2 – Instructing the Jury to Disregard the Law.

The paragraphs quoted by Dillon from the prosecution's closing argument do not instruct the jury to ignore the law, nor do they suggest that the elements of the charges do not matter. The prosecutor's theme, tying together the various offenses charged, was that Dillon stole Thompson's house. That was the bottom line. He then explained that, of course, one cannot really steal a house, because the elements of larceny require a taking and carrying away of someone's property. He then applied the grand larceny instruction to the personal property that Dillon had carried away from the house, which Thompson never got back. From there, he discussed each of the other charges, starting with the uttering, to explain how the evidence matched the elements. Trial Tr. 208–209. At no time did he tell the jurors to ignore the law. Further, the trial court instructed the jurors that "should the attorneys argue that the law is different than what is in these Instructions, then

you must of course be governed by the instructions." *Id.* at 206.  Because there was no prosecutorial misconduct, Dillon could not have been prejudiced by defaulting this claim.

Claim 3 – Instructing the Jury to Convict Dillon
for Something for Which She was not on Trial.

The prosecutor did not instruct the jury to convict Dillon for something for which she was not on trial.  He explained, accurately, that the people usually charged with money laundering were drug kingpins who acquired a lot of money illegally and had to put that money into something that looked legitimate, like a business.  Under the prosecution's theory of the case, Dillon had done the same thing when she illegally acquired Thompson's property and then sold it to obtain cash that looked legitimate. *Id.* at 215–216.  Explaining the offense by analogy to a similar offense is not telling the jury to convict her of something she was not charged with.  He asked the jury to convict her of money laundering, which was one of the charges against her.

Nor did the prosecutor make an improper deterrence argument.  In her argument, Dillon mixes portions of closing argument from the guilt phase, discussed in the previous paragraph, with passages from the prosecutor's argument during the sentencing phase.  In arguing the factors that the jury should consider in setting the length of her sentence, the prosecutor noted, "There's always a general deterrence that the sentencing verdict of this jury sends to the community." *Id.* at

246.   Again, arguing the appropriate sentence for obtaining money by false pretenses, $40,000 for a house that was not legally hers to sell, he noted that "the community has a definitive interest in deterring that sort of fraud.  That goes to the heart of people and their real estate transactions."  *Id.*  Nothing was improper about making this argument during the sentencing phase.  Virginia law recognizes that "while considerations of deterrence should not be the basis for a finding of guilt of the offense, such considerations may be argued in connection with the punishment to be assessed for the crime."  *Wilkins v. Commonwealth*, 482 S.E.2d 837, 838 (Va. 1997) (citation omitted).

Claim 4 – Vouching for the Credibility of a Witness.

Dillon accurately notes that it is improper for the prosecution to vouch for its own witness, and she alleges that the prosecutor vouched for Young's credibility.  Vouching occurs when a prosecutor expresses personal assurances of the witness' credibility or implies that information not presented to the jury supports the testimony.  *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010).   The prosecution discussed Young at two points.  First, at the beginning of his closing, he asked rhetorically how a crime like this happens, identifying a "corrupt notary" as essential for the fraud to occur:

> If you kind of just think through it for a moment, you need a corrupt notary, and I don't mean to disparage Ms. Young.  She seemed like a wonderful old lady, and corruption might not be the best word. I can't think of a

> different word because whatever her intent was, that's kind of what it is left with. She knew her duty. She was supposed to do her duty and she knew she was violating her duties. Ms. Dillon cannot do this without having that corrupt notary, which as you recall was her boyfriend's mom.

Trial Tr. at 208. Although he said she seemed like a wonderful old lady, in context, the entire description can hardly be considered vouching for someone's credibility.

He next discussed Young's testimony as part of the evidence establishing that the signatures on the deed and the power of attorney were not Thompson's signature, even though she had notarized them as being his signature:

> I do want to come back to Ms. Young. She's probably one of the most powerful witnesses that any jury is going to experience. You have a co-defendant who has come in, pending their own felony charges, and they've taken the stand and not just confessed, but shown about as much remorse as a person can show. She has told you exactly what happened in this case at great risk to herself, and yet she explained to you she can't live with her own actions knowing what Ms. Dillon did to Warren Thompson. Okay? I think you got that from Ms. Young, that it's not just that she violated her duties as a notary. That's embarrassing. It's a crime. That's bad, but what is killing Ms. Young is the implication and that is what is driving her. I don't think that could be any more clear. If you remember Ms. Young talking about how she's wrestling with this, that morally, ethically she cannot stand what it's doing to her, tearing her up knowing that she was a part of what happened. She knows it cannot happen without what she did, and it's tearing her apart. The one thing that I think is going to resonate with you is when she talked about spiritually that when she goes to

-20-

church, she doesn't want to be there because spiritually
she knows that she's done wrong, and the people that are
there in church with her think she's a good person and
whatever church she goes to, she's having a hard time
living with her own actions.  You would be hard pressed
to find a person that is that sincere and honest wrestling
with their emotions in what they did.  It is very, very
refreshing, very, very refreshing. There's a time and
place to talk about everything, but do you appreciate all
the lying and deceit and people that don't accept
responsibility and don't show remorse, do you appreciate
someone who actually has a conscious [sic] and actually
just out of that sense of right and wrong will do the right
thing because that is the right thing?  That is the right
thing is to say "Sorry, I apologize.  I need to be honest
and I need to do everything that I can to right the wrong"
which is exactly what she told you.

*Id.* at 209–210.

In making this argument, the prosecutor was summarizing Young's

testimony, what she had said on the stand, and how one could interpret what she

said.  Young was a co-defendant, and her trial was scheduled for a different date,

still pending.  She testified that she had felony charges pending because of her role

in the scheme, perjury, fraud, and forging.  *Id.* at 24.  She testified that she falsely

notarized signatures that she knew were not Thompson's, while he was in jail, and

backdated them to a date before he was in jail.  *Id.* at 16–18.   That she was a co-

defendant with pending felony charges who took the stand and confessed was an

accurate summary of that testimony.

When asked on cross examination if she had been offered a plea agreement in exchange for her testimony, Young said:

> No sir. I know what I did was wrong. I'm trying to right a wrong as much as I can for both mentally, physically it has eaten me up and spiritually it has really haunted me. So I'm just trying to make as much of a right for a wrong that I did. I haven't thought about what I would get. I'm sure I'll be in there too.

*Id.* at 24. She admitted telling Investigator Finney weekly for months after December 2014 that the documents were legitimate, and that she had notarized them in Thompson's presence and at his request on January 14, 2014. When asked on cross when she had changed her story, she said, "I think it was in September. I just, I couldn't take it anymore. I mean—I mean when they start sending you to psychiatrists." *Id.* at 25. Defense counsel cut her off at that point, but on redirect, she was asked if she wanted to explain why she was testifying, and she said:

> Because I'm trying to make as much of a wrong right. I mean what I done was wrong and because of what I done, someone has lost their home and all their belongings. I have to live with that, okay? I have a conscious [sic]. They put me on all this medication and they send me to a psychiatrist. That doesn't take away my guilt. That does not take away my guilt. Spiritually I don't even want to go to church because I'm afraid the person in the corner now is going to say "Oh, you know what she done?" They believed in me.

*Id.* at 26. Given that testimony, the prosecutor's argument that Young had "shown about as much remorse as a person can show" was a fair summary of her

testimony, as was the prosecutor's statement that Young was having a hard time living with what she had done.  The prosecutor said nothing to indicate that he had some inside information to prove she was telling the truth; he was simply arguing the natural inferences from Young's own testimony.  The prosecutor's colloquial use of phrases like "I think" was not an attempt to replace the evidence with his personal judgments.  *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995).  Attorneys are accorded some latitude in presenting closing arguments to the jury, and prosecutors are permitted to try their cases with earnestness and vigor.  *United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009).

Dillon is not prejudiced by defaulting this claim because the prosecution did not vouch for the witness.

Claim 5 – Failure to Disclose Plea Deal.

On July 27, 2016 — the day after Dillon was sentenced —Young entered a very favorable plea agreement with the prosecution.  Originally charged with two counts of perjury, conspiracy to commit forgery, and fraud, the conspiracy charge was dropped.  The fraud charge was reduced to a misdemeanor, interfering with the property rights of another, and the two perjury charges were reduced to misdemeanor charges, official misconduct as a notary.  The court imposed a 12-month suspended sentence, a $100 fine, and 12 months of unsupervised probation.  This plea arrangement was one of the grounds raised in Dillon's motion for a new

trial.  She argues that Young lied when she testified on March 14, 2016, that she had not been offered a plea agreement.

Had there been such an agreement before March 14, 2016, Dillon's claim might be well-founded.  However, there is no evidence that the plea deal was discussed or reached before Dillon's trial.  Many cases are resolved by plea agreement very close to the trial date, and prosecutors may refuse to discuss possible agreements with a cooperating defendant who is testifying, precisely because they want to minimize that avenue of impeachment.  A habeas claim must be supported by evidence, not speculation, and the claim cannot proceed as a fishing expedition.  *Lenz v. Washington*, 444 F.3d 295, 304 (4th Cir. 2006). Because Dillon has no evidence to support this allegation of misconduct, she has not been prejudiced by defaulting the issue.

Claim 6 – Threatening Witnesses.

Dillon alleges that the prosecutor and Detective Finney threatened her ex-husband, James Dillon, and another witness, Michael Waugaman, which prevented those witnesses from testifying in court.  She alleges that other witnesses were also threatened, making them so afraid that they appeared nervous and less than credible when they testified in court.

In support of this claim, Dillon included copies of purported text messages from her ex-husband on March 12, 2016, around 3:17 p.m., in the following run-on communication:

> (1/3) Last year yes that's how i knew u had one never told me why told me i could be charged if i told you anything just wanted to know when we divorced and if i

> (2/3) knew anything about your life since we split i told him no just about boys wouldve [sic] said but wasnt [sic] trying to get myself in trouble and didnt [sic] give him any

> (3/3) info or id be subpeonued [sic] to [sic] and im not

Pet. Ex. 8, at 25-27, ECF No. 1-3.  Apparently, construed in the most favorable light possible to Dillon, this text suggests that being charged if he said anything was the "threat" made against Mr. Dillon.  Detective Finney denied telling Mr. Dillon that he would be prosecuted if he told Ms. Dillon that the detective had spoken with him.  Trial Tr. at 82.  Either way, nothing introduced by Dillon explains what Mr. Dillon would have testified about if he had come to court; nothing suggests that he even knew anything about the facts of the case.  Without evidence that Mr. Dillon planned to testify for Dillon, and without evidence of what he would have testified about, Dillon has failed to allege facts sufficient to show any prejudice from the alleged misconduct.  *Cf. Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990) (holding that a claimant who fails to state what

an investigation would have revealed or what witnesses would have said has not sufficiently alleged a claim for ineffective assistance of counsel).

Detective Finney could not recall if he threatened to prosecute Mr. Waugaman but acknowledged that he said Waugaman could be prosecuted if he found "evidence of his being at fault in any particular transaction in all this matter." Trial Tr. at 80. Such a threat to prosecute someone if there is evidence of that person's involvement in unlawful activity does not constitute misconduct. Further, Dillon again failed to identify any useful testimony that Waugaman would have given if he had come to court.

In her petition, Dillon did not identify what testifying witnesses were so nervous that they had a deceptive appearance while testifying. Of the four witnesses who testified for the defense, only Jonathan Cooper said that Detective Finney had called him a liar and threatened to prosecute him if he "didn't give him the full story." *Id.* at 186. Va. Code Ann. § 18.2-461 makes it unlawful to knowingly file a false police report or give a false report to law enforcement officials with the intent to mislead. Such a threat does not constitute misconduct. Further, there was no reason for the other three defense witnesses to feel intimidated, and the testimony of all four defense witnesses was that Thompson had indicated an intent to transfer the house to Dillon. Because the jurors heard

this testimony from all four defense witnesses, Dillon has failed to demonstrate any prejudice suffered because of her default of this claim.

Claim 7 – Continued Prosecution After Forgery Charge was Dismissed.

Dillon alleges that the trial court erred in allowing the prosecutor to continue the prosecution after the forgery charge was dismissed.  Her argument fails to understand the basis for the trial court's ruling on the forgery charge and more fundamentally fails to understand the nature of the uttering charges.  The only forgery charge against Dillon alleged that she forged a *public record*, in violation of Va. Code Ann. § 18.2-168.  A different statute, under which she was never charged, proscribes forging *any writing*, to the prejudice of another's rights.  Va. Code Ann. § 18.2-172.  The trial court ruled that the deed was not a public record until it had been recorded.  Because Dillon allegedly forged the deed before it was recorded, before it became a public record, the prosecution failed to prove the type of forgery charged in the indictment.  Had she been charged under § 18.2-172, the court said it's ruling would have been different.  Trial Tr. 162–174.

Simply because the forgery charge was dismissed did not render the remaining charges moot.  Forgery and uttering, though related, are two different crimes.  Forgery is the act of making a false document or false writing.  *Forgery*, *Black's Law Dictionary* (11th ed. 2019).  Uttering is the act of presenting a false instrument or writing with intent to defraud.  *Uttering*, *Black's Law Dictionary*

(11th ed. 2019).  As charged in Dillon's case, it was unlawful to "utter, or attempt to employ as true, such forged record . . . knowing the same to be forged."  Va. Code Ann. § 18.2-168.  A person can be guilty of uttering even if she did not herself forge the document; she need only know that it has been forged.  Of course, if she forged it, then she obviously knows that it has been forged.  To convict her of uttering, all the prosecution had to prove was that the deed was not signed by Thompson, that Dillon knew he did not sign it, and that she passed the document to others (the police officer who escorted Clark off the premises, the representative for Quick Fix Real Estate, the attorney who closed the sale).  The trial court instructed the jury on these elements of uttering:

> (1) That the defendant did, directly or indirectly, attempt to use a forged deed;
>
> (2) With intent to defraud;
>
> (3) Knowing the writing was forged; and
>
> (4) That the forged deed was maintained pursuant to law for public business.

Instruction No. 11.

The prosecution's theory of the case was that Dillon knew the deed was forged because she was the one who forged it.  Thompson, Young, and Horton (the document examiner) testified that the signature was not Thompson's, which supported the conclusion that the signature was forged.  Young, the notary,

testified that Dillon signed Thompson's name, which would show Dillon's knowledge of the forgery. Notwithstanding inferences that could be drawn from the testimony of other witnesses, the jury chose to accept Young's testimony, as the jury was entitled to do; that testimony alone was sufficient to support the verdict of guilt on the three uttering charges. *Commonwealth v. McNeal*, 710 S.E.2d 733, 736 (Va. 2011) (holding that evidence was sufficient to support conviction even though the sole witness gave conflicting testimony, because the factfinder had the right to resolve conflicts and choose which evidence to believe).

The prosecution wanted a forgery conviction, in addition to the others, but there is no requirement that a defendant be prosecuted or convicted for every possible offense. The prosecution properly argued that the deed was a forgery based on the evidence presented, and the court properly allowed the uttering and other charges to proceed to the jury based on the evidence. Accordingly, Dillon has not been prejudiced by her procedural default of this claim.

### B. Ineffective Assistance of Counsel Claims.

Claims 8 through 25 allege various acts of ineffective assistance of counsel, either by Dillon's trial counsel or her sentencing and appeal counsel. The state habeas decision rejected each of these claims.[2] As indicated in Section II, a federal

---

[2] The only reasoned opinion in the state habeas case came from the trial court because the Supreme Court of Virginia summarily refused the petition for appeal. A

court cannot grant habeas relief on claims that the state court has already considered on the merits unless the state court's decision is an unreasonable application of federal law or based upon an unreasonable determination of facts. 28 U.S.C. § 2254(d)(1),(2).  The question is not whether the federal court believes that the state court's determination was incorrect, but "whether that determination was unreasonable—a substantially higher threshold."  *Knowles v. Mirazayance*, 556 U.S. 111, 123 (2009).

The state habeas court appropriately started with the standard to be applied in evaluating ineffective assistance of counsel claims, as set forth in *Strickland*, 466 U.S. at 687.  Under *Strickland*, a petitioner must show both (1) that counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment and (2) that the deficient performance prejudiced the defense.  Petitioner must meet both prongs of the test.  *Id.*  "Surmounting *Strickland's* high bar is never an easy task," but "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  A reviewing court must not rely upon "the

federal court on habeas review looks through to the last reasoned opinion in the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

distorting effects of hindsight," but must presume that counsel rendered adequate decisions and that all significant decisions were made in the exercise of reasonable judgment. *Id.* at 689–90. To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," which means "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. I now turn to the doubly deferential review of the state habeas court's decisions on the ineffective assistance of counsel claims.

Claim 8 – Failure to Inform Dillon About Motion Hearing.

Dillon alleges that counsel never informed her about the pre-trial hearing on motions in limine filed by the prosecutor, seeking to exclude Thompson's letter to Dillon from evidence and to prevent mentioning details of Thompson's prior bad acts. The state habeas court held that Dillon failed to show prejudice because she failed to allege what counsel would have done differently if Dillon had been at the motion hearing. *Dillon v. Warden*, Slip op. at *7–8. The trial court prohibited counsel from mentioning Thompson's drug dealing activities during opening statements but did not rule on the admissibility of the letter at that time, saying he would need to hear the evidence in the case before he could determine its relevance. *Id.* Counsel was free to bring up the matter with the court during trial, when Dillon was present, and get a ruling on the issues. The state habeas decision

is not based on an unreasonable interpretation of facts; the trial court's motion ruling is plainly stated in the record. Nor did the court unreasonably determine that Dillon failed to establish prejudice.[3] I will deny this claim.

Claim 9 – Failure to Investigate and Impeach Witnesses.

Dillon alleges that trial counsel failed to investigate and impeach Thompson and Young. The state habeas court held that Dillon failed to establish either deficient performance or prejudice on this claim. Dillon alleges that counsel failed to investigate Thompson's prior behavior, the connection between his criminal case and hers, Thompson's motive to lie, and Thompson's financial status, income, and assets. Further, counsel failed to ask Thompson questions that Dillon believes he should have asked. However, deciding what questions to ask on cross-examination fall within the category of strategy decisions for the attorney to make, based upon his specialized training and experience. When counsel decides upon a strategy, so long as such strategy is within the wide range of reasonable professional choices, a habeas court should not second-guess counsel's performance. *Hunt v. Noth*, 57 F.3d 1327, 1333 (4th Cir. 1995). Dillon's

---

[3] The state habeas court also held that Dillon failed to show deficient performance. Under the Virginia Rules of Professional Conduct, counsel "shall keep a client reasonably informed about the status of a matter" and "shall inform the client of facts pertinent to the matter and of communications from another party that may significantly affect . . . resolution of the matter." Rule 1.4(a) and (c). I need not address whether counsel violated this rule and whether that constituted deficient performance, because Dillon has shown no prejudice. Without prejudice, deficient performance is insufficient to establish ineffective assistance of counsel. *Strickland*, 466 U.S. at 687.

criticisms of counsel's questioning of the witnesses amounts to "grading the quality of counsel's cross examination." *Id.* None of the alleged errors places counsel's performance outside of prevailing professional norms.

The trial record also does not support the claim that counsel did not investigate. Counsel cross-examined Thompson about (1) his disability income, (2) his letter asking Dillon to store his firearms, (3) his request that Dillon pay the bills while he was in jail, (4) the lack of any checks left for her, (5) his acquiescence in her knowledge of his PIN and use of his debit card, (6) his status as a convicted felon, and (7) his prior conversations with Linda Young. Counsel also asked Thompson if he had asked Dillon to speak with the complaining witness in the carnal knowledge case but withdrew the question when the prosecutor objected. Counsel could not have asked these questions had he not investigated the facts surrounding Thompson.

Likewise, Dillon complains about counsel's investigation and cross-examination of Linda Young. She alleges that a proper investigation would have informed him that Young did not change her story "until the day after Dillon obtained a protection (sic) order against her son." Pet. 81, ECF No. 1. She then states that trial counsel forwarded a copy of the September 12, 2015, protective order to her new attorney when she changed lawyers. If counsel had a copy of the protective order, then he had investigated Young's motive. He also had copies of

text messages between Young and Dillon, in which Young expressed concern for Dillon's safety after the emergency court hearing, which is inconsistent with the motive to lie alleged by Dillon. Dillon also alleges that an investigation would have discovered that Young didn't regularly attend church, raised two children who were felons, "and likely couldn't pass a drug test herself." *Id.* at 84. Dillon offers no supporting evidence for these defamatory and largely irrelevant claims.

Counsel cross-examined Young extensively about the number of times she told Detective Finney that Thompson had signed the deed and the power of attorney. Admittedly, he did not ask about her testimony at the preliminary hearing, but the habeas court was not unreasonable in determining that Dillon was not prejudiced by the failure to elicit one more admission that she had previously told a different story, given Young's admission that she told Detective Finney weekly for nearly a year that the signatures were Thompson's.

I find that the state habeas court reasonably concluded that Dillon failed to establish either deficient performance or prejudice on this claim. Accordingly, I will deny this claim.

Claim 10 – Misinformation About the Time She Faced in Prison.

Dillon asserts that counsel failed to advise her about how much time she faced on each charge, that sentencing guidelines were not binding, and that the jury could impose a larger sentence. Further, Dillon contends that she would have

-34-

accepted a plea agreement had she been properly informed.  In support of her claim, she attached a printout from the Virginia Case Information System online, listing the 15 charges against her for hearing on March 16, 2016.  *Id.* Ex. 13 at 36, ECF No. 1-3.  On the far-right hand side of the page, numbers are written beside each case, which appear to be sentence ranges, such as 1-20, but the second numbers are largely unreadable.  Dillon alleges, as she did in the trial court, that those numbers are written in a different ink and were not on the paper when counsel discussed a possible plea bargain with her.  The paper has handwritten notations on it, purportedly made by trial counsel, listing six charges in a bracket, with "1 d – 6 months" on the right.  *Id.*  Above that notation is a handwritten asterisk beside "Client refused to accept bc will lose her job.  Told could spent rest of life in jail." *Id.*  "NP" is written beside the other nine charges.  *Id.*  She did not attach any correspondence showing that a formal plea offer had been presented by the prosecution.

The state habeas court found that Dillon failed to establish either deficient performance or prejudice.  First, the court found, because of the absence of an actual offer from the prosecution, that Dillon failed to establish that a plea had been offered. The Virginia sentencing guidelines recommended 1 day to 6 months, as noted, but even if a defendant pleads guilty to a reduced number of charges, unless the government specifically agrees to sentence within the guidelines as part

of the bargain, the court can still sentence outside those guidelines.  Second, the court did not find Dillon's claim that she would plead guilty to be credible, given her ongoing protestations of innocence.   In the absence of proof that the prosecution was willing to offer such an agreement, Dillon could not establish that she was prejudiced by the advice of counsel.

A federal habeas court cannot grant relief just because it disagrees with the state court's decision, or even if the court believes the state court decision is incorrect; rather, the question is whether the state habeas court's decision is unreasonable, a substantially higher threshold.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  The facts determined by the state court are presumed correct.  28 U.S.C. § 2254(e)(1).  Based on the facts determined by the state habeas court, I cannot say that the court's decision is unreasonable, and therefore, I must deny this claim.

Claim 11 – Failure to Hire a Handwriting Expert.

In finding that Dillon failed to show deficient performance or prejudice, the state habeas court noted that Dillon has not identified an expert who should have testified, nor has she provided evidence that any such expert would opine that Thompson signed the challenged documents.  She has speculated that such an expert could testify that it was "possible" or "likely" that Thompson signed the documents.  Such speculation does not state a claim for habeas relief but seeks a

fishing expedition for a possible different result. *Lenz*, 444 F.3d at 304. Without evidence that another expert holds an opinion favorable to Dillon, she has not established prejudice. The state court's decision is not contrary to nor an unreasonable application of federal law, nor is the decision based on an unreasonable determination of facts. I will deny this claim.

Claim 12 – Failure to Obtain Preliminary Hearing Transcripts.

Dillon asserts that trial counsel's performance was deficient because he did not obtain transcripts of the preliminary hearing. She alleges that transcripts would reveal that (1) Linda Young testified then that Thompson signed the documents, (2) Thompson admitted giving Dillon his debit card and PIN, expecting her to use them, and (3) Detective Finney admitted that he did not fully investigate the case or Dillon's involvement with Thompson. The state habeas court denied this claim because Dillon failed to show that transcripts were available to obtain and because there was no prejudice to her defense because of failure to have those transcripts.

Young testified at trial that she initially told police in December 2014 that Thompson signed the documents and that she had repeated that story consistently on a weekly basis until September 2015. Evidence that one of the many times she maintained that story was at the preliminary hearing was not likely to change the outcome of the trial. Likewise, the difference between Thompson's trial testimony — that he did not have a problem with Dillon having the debit card and knowing

the PIN — and the alleged preliminary hearing testimony was not a significant difference.  Finally, Detective Finney admitted at trial that he did not investigate Dillon's involvement with Thompson because he did not consider it relevant to the case.  Finney did testify at trial that he had fully investigated the case; that is not necessarily inconsistent with his alleged testimony nearly a year earlier at the preliminary hearing.  Officers often continue to gather evidence and re-evaluate cases between preliminary hearings and trials.  For these reasons, there is nothing unreasonable about the state habeas court's factual findings and legal conclusions on this claim.  Accordingly, I will deny this claim.

Claim 13 – Failing to Obtain Prior Year Police Reports.

Dillon alleges that counsel should have obtained police reports from 2013 to establish that Thompson's estranged wife had a habit of coming to the property and trying to claim his belongings.  The state habeas court reasonably found that Dillon failed to establish either deficient performance or prejudice.  Officer Thayer testified on cross-examination that the dispatcher told him while he was in route to the home that prior complaints had been made about this same person trying to take property from the house.  Trial Tr. at 142.  Police reports would not have provided any additional information.  Failure to introduce cumulative evidence does not demonstrate prejudice.  *Huffington v. Noth*, 140 F.3d 572, 581 (4th Cir. 1998).  I will deny this claim.

Claim 14 – Failure to Introduce Evidence Provided by Dillon.

Dillon lists a litany of evidence provided to her attorney that he did not use at trial: Facebook messages between Dillon and Sean Elkins (Thompson's cousin), receipts of deposits onto Thompson's inmate account, a picture of Thompson wearing a red bandana over part of his face and a hat with a marijuana emblem, texts between Young and Dillon regarding Young's son's abusive behavior, the letter Thompson sent Dillon from jail, receipts for a U-Haul and a post office box, texts from Dillon's ex-husband, and texts from Thompson's estranged wife. The state habeas court found neither deficient performance nor prejudice. Decisions by counsel regarding what evidence to introduce fall within the category of strategy decisions which are accorded great deference by the courts. *Gonzalez v. United States*, 553 U.S. 242, 248–49 (2008). This is because attorneys are trained in the rules of evidence and know what is admissible and what is not. As the state court noted, "Reasonable counsel would not have tried to impeach a witness in a manner not permitted by the rules." *Dillon v. Warden*, slip op. at *23. This decision is a reasonable application of federal law.

Nor has Dillon been prejudiced by the failure to introduce the evidence. Records from the jail already showed how much money she put on Thompson's account. Facebook and text messages written by parties who were not present to testify in court would be inadmissible hearsay. Receipts, without testimony

explaining their relevance, would not be admissible. Dillon argues that the photograph of Thompson would show the jurors that Thompson was not a "clean cut, poor innocent guy," as the prosecution contended; as the state habeas court noted, that is not a proper purpose for introducing a picture, and the Sixth Amendment does not require counsel to act unethically. I will deny this claim.

Claim 15 – Failure to Prepare for Sentencing and Lying to the Court.

Dillon alleges that trial counsel failed to prepare for sentencing. In particular, he did not subpoena any witnesses for the sentencing phase, and then lied to the court by saying he had arranged for them to be there at 4:00, when in fact, Dillon had to call people with no advance notice and ask them to come to the court as quickly as possible. Only two witnesses were able to come.

The state habeas court found neither deficient performance nor prejudice, noting that counsel presented the testimony of two witnesses, and that deciding what witnesses to call is a strategic decision for counsel to make. That is a correct statement of the law. Because the state habeas court reasonably found that Dillon was not prejudiced by counsel's conduct, I need not address the performance issue. Dillon alleges that character witnesses would have offered evidence that she had no criminal history, an excellent work ethic, and was a single mother of four. The witnesses who testified at the sentencing hearing did testify that she was a hard-working single mother who did her best to provide for her children. Additional

witnesses would have been cumulative, and failure to introduce cumulative evidence is not deemed prejudicial.  *Huffington*, 140 F.3d at 581.

Claim 16 – Failing to Properly Inform Dillon About her Right to Testify.

Dillon alleges that trial counsel did not advise her of her right to testify until "called upon at trial" and then told her that if she testified, she was waiving her right to appeal.  Pet. 137, ECF No. 1-1.  The state habeas court found that her claim was contradicted by the record, noting that when the court asked counsel to call his next witness after Mr. Diorec, counsel said, "Your honor, the only witness I have left is Ms. Dillon.  It might be better taken after lunch instead of this moment.  It's going to be quite a while, quite likely."  Trial Tr. at 198.  After the lunch recess, the defense rested instead of calling Ms. Dillon.  The state habeas court held that:

> The clear inference from this exchange is that the petitioner was aware of her right to testify and ultimately she chose not to testify.  In addition, she has failed to proffer what her testimony would have been. . . . It is unlikely anything she would have testified to would have had a reasonable probability of creating a different outcome.  Consequently, Dillon has failed to establish prejudice . . .

*Dillon v. Warden*, slip op. at *20–21.

In her § 2254 petition, Dillon provided her planned testimony in detail, which she had not done in the state habeas petition.  She is asking this court to consider different operative facts from what she presented to the state court.  To

the extent that her current allegations exceed what she presented to the state habeas court, she has failed to exhaust the claim. *Duncan*, 513 U.S. at 365–66. Based on what she presented to the state habeas court, I find nothing unreasonable in the state court's determination of facts and conclusion of no prejudice.

Even if one were to consider the testimony she has now proffered, it is unlikely that her testimony had a reasonable probability of creating a different outcome. Some of what she would testify to was already in evidence, such as Young originally saying that Thompson signed the documents. Some of her proposed testimony may well have been inadmissible, such as her speculation on the motive for Young changing her story. Finally, some of her proposed testimony — that she left $3000 in Thompson's bank account — would contradict the documentary evidence, the copies of Thompson's bank statements. Because the state court's finding of no prejudice is reasonable, I need not address the performance prong, and I will dismiss this claim.

Claim 17 – Failing to Request a Continuance.

Dillon alleges that counsel should have requested a continuance of the trial date because he was not prepared and because her boyfriend had been killed in a car accident five weeks before trial, leaving her emotionally unable to adequately participate in her defense. In dismissing this claim, the state habeas court noted that whether to request a continuance is a strategic matter for counsel. Trial

counsel had already requested and received a continuance on two prior dates, both times because he needed more time to prepare.  Without evidence that reasonable counsel would have believed that he had a realistic chance of obtaining a third continuance, Dillon cannot establish that a reasonable attorney would have necessarily requested a continuance.  *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005).

The state habeas court also held that Dillon failed to establish prejudice because she did not show that a continuance would have led to any difference in the evidence presented.  I cannot say that this decision is an unreasonable application of federal law, and I must deny this claim.

Claim 18 – Counsel's Inappropriate Behavior Created a Conflict of Interest.

Dillon alleges that counsel gave her a hug instead of shaking her hand, which made her uncomfortable.  Later, he showed up at the bar where she worked, unannounced, to bring her discovery.  Finally, when he had to cancel an appointment, he texted her a photo of his sleeping toddler.  From those alleged facts, Dillon has drawn the conclusion that counsel was making sexual advances towards her, which she rejected.  From there, she alleges, with no supporting evidence, that trial counsel intentionally "threw" her case in retaliation for her rejection, including by failing to timely subpoena witnesses and lying to the court about his lack of preparation for the jury sentencing.

The state habeas court held that:

> [T]he facts asserted by the petitioner do not establish counsel was seeking a relationship outside the attorney client relationship.  Every instance referred to by the petitioner, *e.g.,* showing up at her place of employment to give her some documents related to her case, counsel was working on [Dillon's] criminal case.  There are no allegations of the attorney asking her out, or doing any actions not related to his work.  Dillon has failed to establish counsel was acting unethically.  As a result, Dillon has failed to establish either deficient performance or prejudice . . .

*Dillon v. Warden*, at 6–7.  I cannot say that this was an unreasonable determination of facts, nor was it an unreasonable application of federal law.  I must deny this claim.

Claim 19 – Failure to Move to Dismiss all Charges.

For the reasons discussed in dismissing Claim 7 above, this claim has no merit.  The prosecution need not charge or convict a person of forgery to charge and convict her of uttering or of any other fraud offenses.  A person can utter a forged (not genuine) document if she knows that it is not genuine, even if she did not forge it herself.

Further, the fact that the forged deed was filed in the deed book does not make it genuine.  Dillon makes much of the fact that the deed is still recorded, and that the company she sold the home to (or its subsequent purchaser) is the lawful owner.  The settlement and dismissal of Thompson's civil suit against Dillon,

Young, and Star City Investments is not dispositive.  By definition, a settlement is a compromise between the parties on their own terms, rather than allowing the court to make a decision that leaves everyone unsatisfied.  Based on the settlement agreement entered between Thompson and Star City,[4] Thompson executed a Deed of Confirmation, which recited the entire history, including the allegation that Thompson's signature had been forged on the deed to Dillon.  This deed was then recorded to quiet title to the property, and consideration was paid to Thompson for the property.  If anything, this settlement supports a finding that the deed to Dillon was forged; the subsequent good faith purchaser had to pay again for the property, and Thompson executed a new deed to ensure valid title to the new owner.  The state habeas court's decision dismissing this claim was reasonable and appropriate. I will deny this claim.

Claim 20 – Failure to Object to Prosecutorial Misconduct.

This claim is without merit because Dillon failed to establish any prosecutorial misconduct, as the state habeas court reasonably determined.  For the reasons stated in response to Claims 1 through 6 above, Dillon's prosecutorial misconduct claims are without merit, and counsel's performance is not deficient

---

[4] Dillon attached a copy of the dismissal order as Exhibit 9 to the § 2254 petition. Pet Exs, at 28–30, ECF No. 1-3.  In the state habeas case, however, Dillon included the full settlement agreement, including a copy of Thompson's Deed of Confirmation.

for failing to make a meritless objection.  *United States v. Mason*, 774 F.3d 824, 833 (4th Cir. 2014).  I will dismiss this claim.

Claim 21 – Failure to Familiarize Himself with the Elements of Charges.

Dillon alleges that trial counsel was insufficiently familiar with the facts of her case as they relate to the elements of the charges against her.  As evidence, she pointed to counsel's motion to strike the grand larceny and embezzlement charges, at which time the prosecutor explained that the grand larceny was for the belongings in the home, but the embezzlement was for the bank account:  "I would like to focus a portion of the discussion on the bank account which had been the focus of the prosecution in regards to the embezzlement, that she clearly was given control over the financial assets."  Tr. at 162.  Trial counsel responded, "So the argument is the embezzlement is the bank account?"  *Id.*

The state habeas court dismissed the claim, finding that a single statement by counsel, taken out of context, did not establish that counsel did not understand the charges or their elements.  *Dillon v. Warden*, at 18.  Dillon has elaborated in greater detail that the credit card fraud and embezzlement charges "had conflicting elements," and she should not have been convicted of both.  Pet. at 180.  As respondent points out, Dillon did not make that specific argument in her state habeas.  To properly exhaust a claim, the petitioner must present to the state court the same operative facts and the same controlling legal principles that she seeks to

present to the federal court. *Duncan*, 513 U.S. at 365–66. Because this claim alleges ineffective assistance of counsel, however, the failure to exhaust may be overcome by the test set forth in *Martinez v. Ryan*, 566 U.S. 1 (2012). The Supreme Court allows a federal court to consider a defaulted claim for ineffective assistance of counsel if (1) the claim of ineffective assistance is a "substantial claim;" (2) the "cause" for default is the lack of counsel in state habeas proceedings; (3) the state habeas proceeding was the first one in which petitioner could raise ineffective assistance claims under state law; and (4) the state habeas proceeding was the first time ineffective assistance of counsel was raised. *Id.* at 13–15.

Virginia does not allow claims for ineffective assistance of counsel on direct appeal and such claims must be raised in habeas corpus proceedings. *Lenz v. Commonwealth*, 544 S.E.2d 299, 304 (Va. 2001). The respondent does not dispute that Dillon had no attorney in state habeas proceedings or that lack of counsel caused her to define her claim poorly in state court. Respondent asserts that the claim is not substantial and must fail because it is contradicted by the record, which states that the embezzlement charge was for the bank account and the credit card fraud was for Dillon's purchase from Mary Kay on Thompson's debit card.

For a claim to be "substantial" within the meaning of *Martinez*, it must have some merit. *Martinez*, 566 U.S. at 14. This does not mean that petitioner

automatically prevails on the claim, only that the claim has sufficient merit to warrant consideration by the court. I find that this claim is substantial.

Dillon is alleged to have used Thompson's debit card to withdraw most of the funds from his bank account. She is alleged to have used the same debit card to purchase items from Mary Kay. If the debit card had not been entrusted to her, then she could not be guilty of embezzling from the bank account. Embezzlement requires proof of converting someone else's property that had been entrusted to her, with fraudulent intent. *Lee v. Commonwealth*, 105 S.E.2d 152, 154 (Va. 1958). In convicting Dillon of embezzlement, the jury must have found that the debit card had been entrusted to Dillon, for she had no other way to access the bank account. To be convicted of credit card fraud under the charging statute, Va. Code Ann. § 18.2-195, one must misuse a bank card that is wrongfully in her possession. "One's misuse of a credit card lawfully possessed . . . (embezzlement), as in the instant case, is distinct from one's misuse of a credit card wrongfully in his or her possession, which is the focus of [section] 18.2-195(1)(a) and (b)." *Saponaro v. Commonwealth*, 655 S.E.2d 49, 51 (Va. Ct. App. 2008) (internal citation omitted). Because Dillon could not have been entrusted with the card and simultaneously wrongfully possess it, her claim has merit.

I find that only one of the two convictions can be valid. However, the one-year sentence she received on each these two charges was run concurrently with

the 30-year sentence she is serving for grand larceny, obtaining money by false pretenses, and money laundering.  When a defendant receives concurrent sentences on multiple charges, if one of the convictions is valid, a habeas court need not pass on the validity of the other conviction, so long as "there is no substantial possibility that the unreviewed conviction will adversely affect the defendant's right to parole or expose him to a substantial risk of adverse collateral consequences."  *United States v. Charles,* 932 F.3d 153, 159 (4th Cir. 2019) (emphasis and citation omitted).  Relying upon this concurrent sentence rule, I will dismiss this claim.

Claim 22 – Failure to Object to Amount of Restitution.

Dillon alleges that sentencing counsel was ineffective in failing to object to the restitution amount of $98,900, which she calls "outrageous and unsubstantiated."  Pet. 191, ECF No. 1-1.  The state habeas court held that Dillon established neither deficient performance nor prejudice, because the amount was reasonable, based upon the evidence, and counsel had no basis for objecting to the amount of restitution.

Evidence during the trial included that Thompson's home had an assessed value of $100,000, although Dillon sold it for only $40,000.  Further, Thompson had paid nearly $7,000 for a car and another $1,300 for a car stereo.  He had over $3,000 taken from his bank account.  Finally, he testified that all his furniture and household belongings were gone, as were tools in his garage, including air

compressors.  Used household furnishings may not have a high dollar value, but they have some value, and tools, especially tools for working on automobiles, may be expensive.

Under Virginia law, a trial court's order of restitution will not be reversed unless it is an abuse of discretion, meaning that the restitution order will stand unless reasonable jurists could not differ in finding the order unreasonable. *Burriesci v. Commonwealth*, 717 S.E.2d 140, 143 (Va. Ct. App. 2011).  A victim is entitled to be made whole, and if the restitution amount is supported by a preponderance of the evidence and is reasonable in relation to the offense, the order will be upheld.  *Id.*  Based upon the law and the evidence in the record, the state habeas court reasonably determined that the restitution amount was reasonable, and therefore, that counsel's failure to object was also reasonable.  I will dismiss this claim.

Claim 23 – Failure to Object to Sentencing for Stealing a House.

Dillon alleges that counsel was ineffective because he did not object to the judge sentencing her for "stealing a house."  Pet. 196, ECF No. 1-1.  The state habeas court held that Dillon was sentenced only on the ten charges for which she was convicted, not for stealing a house, and therefore, counsel had no reason to object.  The court dismissed the claim because Dillon established neither deficient performance nor prejudice.  The state habeas court's decision is reasonable and

fully supported by the record.  The trial court imposed a term of years for each conviction.  No sentence was imposed for any offense other than those for which she was indicted and convicted.  Colloquially referring to the entire course of behavior as "stealing a house" did not change what Dillon was charged with, convicted of, and sentenced for.  I will dismiss this claim.

### Claim 24 – Failure to Familiarize Himself with the Case and Filing Incorrect Motions and Inadequate Briefs.

The state habeas court noted that the minor inaccuracies in counsel's motion to set aside the verdict and in his appellate briefs were irrelevant to any of the issues before the court and did not constitute deficient performance, nor was Dillon prejudiced by those details.  Although Dillon considered the appeal inadequate because counsel did not raise all the issues that she wanted him to raise, the state habeas court correctly held that courts give broad deference to an attorney's decisions regarding what issues to raise on appeal, and an attorney's strategic decisions in that regard are virtually unassailable.  I find that the state court's determination of facts and application of law were reasonable, and I will dismiss this claim.

### Claim 25 – Failure to Raise Prosecutorial Misconduct on Appeal.

Dillon did not raise this claim in her state habeas petition, and I find the claim to be without merit.  First, for the reasons discussed in Claims 1 through 6, Dillon has not shown any prosecutorial misconduct.  Second, even if there had

been such misconduct, an attorney is not required to raise every meritorious issue desired by the client, if in his professional opinion, other issues have more merit. *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  I will dismiss this claim.

Claim 26 – Cumulative Error.

Dillon alleges that the cumulative effects of the errors alleged combined to deprive her of her right to effective counsel and due process of law.  The Fourth Circuit does not recognize the doctrine of cumulative error.  Claims of ineffective assistance of counsel must be reviewed individually.  *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998).  Accordingly, I will dismiss this claim.

V.

For the reasons stated, I will grant the respondent's Motion to Dismiss the petition.

I decline to issue a certificate of appealability because Dillon has not made a substantial showing of the denial of a constitutional right and reasonable jurists would not find the court's procedural rulings to be debatable or wrong.

A separate Final Order will be entered herewith.

DATED:  September 21, 2023

/s/ JAMES P. JONES
Senior United States District Judge